# United States Court of Appeals

## For the First Circuit

No. 01-2624

THOMAS F. WALLACE,

Plaintiff, Appellant,

v.

O.C. TANNER RECOGNITION COMPANY, O.C. TANNER SALES COMPANY,
AND O.C. TANNER COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

David Rapaport with whom Rapaport & Rapaport was on brief for
appellant.
Mark W. Batten with whom Bingham McCutchen,LLP was on brief
for appellees.

August 14, 2002

**COFFIN**, <u>Senior Circuit Judge</u>.    Appellant Thomas Wallace was fifty-three years old when he was terminated from O.C. Tanner Company ("Tanner") after twenty years of employment and repeated recognition as one of the company's top sales managers.    He disputes the company's claim that he was spending excessive time on a personal project that he had concealed from Tanner officials, and claims that age discrimination led the company to replace him with his thirty-six-year-old subordinate.    The district court granted summary judgment for appellee Tanner, finding that Wallace failed to allege sufficient evidence of age-based animus.    We affirm.

## I. Background

O.C. Tanner Company, based in Salt Lake City, Utah, assists companies in developing programs to recognize and reward their employees.    Its services include providing custom gifts or jewelry for service anniversaries.    Tanner hired appellant in 1975 to help develop a market in the Northeast.    He began as a salesperson in the Boston area, advanced to Regional Sales Manager as the supervisor of several other employees, and achieved a record of superior performance in generating new business.    His region ranked in the top ten for sales for twelve of the last fifteen years of his employment, and among other recognitions, he shared the "Most Impressive Customer Commitment Award" with another regional manager in 1992.

In July 1996, however, the Sales Director for the Boston region (and appellant's superior), Rulon Horne, drafted a memo identifying eight concerns that had developed about appellant's

-2-

performance and other work-related matters.  According to Horne, appellant's personal sales numbers had been lagging and he had become less involved in the region's business and activities.  Doug Duckworth, Horne's predecessor, testified that he communicated a similar concern about appellant's "lack of involvement" in the region to Horne during the transition in sales directors earlier in the year.  In addition to declining sales, the issues identified in Horne's memo included appellant's intimidating management style, lack of respect for Horne,  resistance to signing a confidentiality agreement, and the lack of growth in repeat sales in the Boston region.   Horne also noted two operational changes the company wished to effectuate in the Boston office: (1) to end the relationship with appellant's wife's brochure business, and (2) to either relocate the regional office from a building owned by appellant or obtain a lease from him.  Finally, the memo noted appellant's minimal use of his laptop computer, which frustrated the company's effort to track activity at its field offices.

A few days after writing the memo, Horne met with his superiors to discuss his concerns.  Present at the meeting, which was held at the corporate office in Salt Lake City, were Tanner's chief executive officer, Don Ostler; its president, Kent Murdock; the executive vice president of sales, Tim Treu; and the vice president of sales, Dale Sansom.  The group agreed that appellant would be offered the opportunity to correct the problems, and Horne and Treu arranged to meet with Wallace in Boston at the end of August.

In sessions on August 27 and 28, Horne and Treu reviewed with appellant the concerns listed in Horne's memo. Horne testified that appellant was not given advance notice of the agenda in order to prevent him from "pre-framing" his responses. Although the parties differ on certain particulars of the meetings, they agree that appellant made a commitment to address each of the eight items. In response to questions about sales performance, appellant explained that he had credited much of his own personal business to Doug Mercer, the senior sales associate in the office. Treu's notes of the meeting on the first day report that Wallace also attributed his lower performance to other factors, including concern about his daughter's health. In his deposition, however, appellant testified that he may have made reference to his daughter's illness, but said that her health was not a distraction that affected his work for Tanner. He attributed his lower numbers entirely to the allocation of his business to Mercer and agreed to meet with his staff to re-assign the credit for sales that he -- Wallace -- had generated.[1] He also promised quick action on other issues, stating that a lease and the signed confidentiality

---

[1] At oral argument, Wallace's counsel asserted that the company's claim of lower sales performance was inaccurate and thus evidence of pretext. By agreeing to pursue re-allocation of business, however, Wallace effectively acknowledged that the company's figures were based on the information available to it. Wallace also emphasizes that his sales at the end of his tenure were affected by the loss of a major customer, Digital Equipment Corp., which chose a competitor that underbid Tanner by $500,000. Wallace contends that he was not allowed by his superiors to lower Tanner's bid to meet the competition.

agreement would be submitted early the next week, and he would "dial in" on his laptop immediately.

Treu and Horne returned to Utah on Wednesday, August 28. On Friday, August 30, the Boston office administrator, Patty Prew, separately called two headquarters employees who worked in the sales promotion and customer service departments, apparently to express surprise that appellant had not been fired. Prew told the two employees, Kathie Lewis and Carol Anderson, that appellant was not actively involved in the region's business and was spending substantial time on other, personal activities. Prew asked that Horne call her at home the next day so that she could communicate her concerns directly to him. In a ninety-minute phone conversation with Horne, she reported that appellant had paid little attention to Tanner business for the past two years because of his preoccupation with a personal real estate investment. He had purchased a large parcel of land that he hoped to develop for commercial, residential and recreational uses.

Aware that Prew was unhappy with appellant because she felt underpaid,[2] company officials sought confirmation of her information from other sources. Anderson, one of the headquarters employees whom Prew had contacted, told Horne and Treu that her once-regular contacts with appellant had dropped off in the

---

[2] Appellant, in fact, had told Treu and Horne during their meetings earlier in the week that Prew had become a problem in the office because of her dissatisfaction with her pay.

-5-

previous year or so.[3]  Lewis reported only two conversations with appellant during the eight months she had been working with his region.  Horne spoke with Mercer -- ultimately appellant's successor -- who reported that appellant was no longer heavily involved in Tanner business.  Horne and Treu also did an online search of Boston area newspapers and found that they were "full of articles" covering meetings and "battles" concerning appellant's real estate project; Treu's notes describe the coverage as "one of the biggest ongoing stories of the year."  According to Horne's deposition testimony, this information "filled in the unanswered question . . . as to what had really gone on here, and it created, in our mind, the perception that [appellant] had not been forthright in his answers to us as to why he was distracted."

The four officers who had met previously to discuss appellant's work situation -- Horne, Treu, CEO Ostler and company president Murdock -- again consulted and decided to terminate him.  Murdock testified that the company officials felt "duped" and "misled" by the discussions with appellant in Boston the previous week, concluding that "he was collecting a lot of money for not doing anything at O.C. Tanner."  Horne and Treu flew to Boston and told appellant on September 5 that he was being terminated,

---

[3]  In Treu's notes of an August 30th conversation with Anderson, he reported that she had not spoken with appellant "more than a couple of times in ages," and she told him that "even our Boston customers make fun of the fact that Tom is no longer involved."

Appellant, however, notes that he had the discretion to delegate contact with Anderson and Lewis to his staff; Anderson acknowledged in her deposition that Prew was her main contact in the Boston office.

attributing the decision to his involvement with the real estate development.

In depositions and documents, appellant offered a competing version of his work habits. He disputed the contention that he was neglecting his Tanner duties in favor of the real estate project, stating that he spent relatively little time on the development. He stated that he devoted full days to Tanner business, though he worked often at home and sometimes in the middle of the night. His counsel elicited from both Prew and Mercer an acknowledgment that they did not know either how he spent his time away from the office or what he was doing when he was in the office.

To prove that his termination was not only unjustified, but motivated by age discrimination, appellant offered evidence of statements by three Tanner officials. All but one occurred during the mid-1990s and involved comments by Horne's two predecessors as Director of Sales, Duckworth and Brent West. According to appellant, West was the first to ask about his retirement plans. Appellant responded that he had no plans to retire and intended to remain with Tanner until age sixty-five. When West asked the same question about six months later, appellant gave the same answer, prompting West to reply: "Well, Tom, don't you think that, you know, you get tired of this business, and 65 is a long way away."

The issue of appellant's retirement came up again when Mercer, his associate sales representative, bypassed opportunities to apply for Regional Sales Manager positions in other areas of the country. Duckworth asked appellant why the thirty-six-year-old Mercer did

not seek the positions and was told that he did not want to leave New England. Duckworth then asked appellant when he planned to retire. This occurred twice, and appellant informed Duckworth both times that he planned to stay on until age sixty-five.

The final age-related episode occurred during the meeting in which Tanner officials decided to fire appellant. Murdock, the company president and a former trial lawyer, asked about Wallace's birth date. According to Murdock's testimony, he noted at the meeting that appellant was in the protected class for age discrimination, and that "if he decided to sue over his termination, . . . he would probably have to hang his hat on age discrimination, but since we weren't doing that, we should go ahead." Horne's notes of the meeting include a notation of appellant's age, date of birth, and years of service.

The district court concluded that appellant had not advanced sufficient evidence to support a finding that he was terminated because of his age. Wallace v. O.C. Tanner Co., 177 F. Supp. 2d 73, 77 (D. Mass. 2001). The court noted that, even if it disregarded the defense that Wallace was terminated for neglecting his work in favor of the real estate project, his evidence at best supported the conclusion that Tanner fired him because it knew that Mercer did not want to leave New England and it preferred Mercer to Wallace when faced with the choice.

On appeal, appellant contends that summary judgment was improper because he proffered sufficient evidence for a jury to conclude that Tanner's reason for firing him was pretextual, and

that the company's decision to replace him with his subordinate was motivated by the age difference between the two men. Our examination of the record, conducted de novo, see Rivera-Rodríguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 21 (lst Cir. 2001), persuades us that summary judgment was appropriate.

## II. Discussion

Plaintiffs on appeal present their case under the familiar McDonnell-Douglas-Burdine-Hicks burden-shifting framework. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 515 (1993); see also Rivera-Rodríguez, 265 F.3d at 25.[4] We jump over that starting point here, however, as both parties direct our focus to the ultimate question: whether the totality of the evidence, including inferences in plaintiff's favor, "has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by age discrimination," Domínquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (lst Cir. 2000); see id. at 430 ("At the summary judgment phase, 'courts should not unduly complicate matters . . . by applying legal rules which were devised to govern the basic allocation of burdens and order of proof.'" (citation omitted)).

As the district court recognized, appellant's case inevitably stands or falls based upon the strength of his evidence that the

---

[4] Wallace brought claims under both the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Massachusetts Fair Employment Practices Act, Mass. Gen. L. ch. 151B, § 4.

-9-

actual trigger for his discharge was age-based animus -- whatever the reason asserted by his employer.  See Domínguez-Cruz, 202 F.3d at 430 ("'The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different . . . age . . . and everything else had remained the same.'") (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir. 1996)).  The evidence appellant proffers simply does not have sufficient weight to support such a conclusion.

None of the inquiries from West and Duckworth about his retirement plans had significant probative value; they were brief, stray remarks unrelated to the termination decisional process. See, e.g., Shorette v. Rite Aid of Maine, 155 F.3d 8, 13 (1st Cir. 1998) (asking the plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing").  The longest of the four exchanges -- when West observed that sixty-five "was a long way off" and suggested that appellant would get tired of the business -- occurred during a conversation in which West expressed concern about his own tenure and an anticipated demotion.  Nothing in the circumstances reflects West's or the company's inclination to end appellant's employment based on his age.

Although Duckworth's questions arose in the context of the younger Mercer's future with Tanner, there was no accompanying suggestion that appellant's value to the company had diminished because of his age; certainly, company officials are permitted to

gather information relevant to personnel planning without raising the specter of age discrimination.  See, e.g., Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."); Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.").

Whatever possible weight these comments might have had if either Duckworth or West had been involved in, or consulted on, the decision to fire appellant is circumscribed -- if not entirely negated -- by the fact that neither of them played a role in the termination.  See, e.g., Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) ("Typically, statements made by 'one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case.'"); Shorette, 155 F.3d at 13 ("'[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself' normally are insufficient to prove [an] employer's discriminatory animus.").  Moreover, the most recent of the four comments (West's reference to sixty-five as "a long way off") occurred in "late 95, 96," while at least one of the comments occurred in 1994 or earlier, further diminishing their collective probative value.  See, e.g., Straughn v. Delta Airlines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (stating that even comments by

-11-

decisionmakers have limited probative value when they are "temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question . . . .").

Murdock's comments are only superficially more potent. To be sure, he was a crucial decisionmaker, and appellant's termination was the very purpose of the meeting in which the references to age -- indeed, to age discrimination -- were made. Murdock's testimony that the discussion focused not on appellant's age per se, but on the possibility that he would bring an age discrimination lawsuit is inherently plausible, however, and appellant offers no evidence to cast doubt on its credibility. Although such discussions may be documented only rarely in an employer's notes, we think it likely that the potential for legal action is routinely addressed when company officials meet to consider terminating an employee. See, e.g., Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1113 (3d Cir. 1997) (en banc) (discounting evidence that employer described the possibility of litigation as a "problem" because "[n]eedless to say, even an ultimately unsuccessful claim may constitute a 'problem'"); Partington v. Broyhill Furn. Indus., Inc., 999 F.2d 269, 271 (7th Cir. 1993) ("No inference of guilt can be drawn from awareness of one's legal obligations; to do so would be to promote the ostrich over the farther-seeing species."); Flebotte v. Dow Jones & Co., 51 F. Supp. 2d 36, 42 (D. Mass. 1999) (stating that handwritten notes referring to "age issue" and discussion about age discrimination suit "indicate the commonplace awareness of the risk

-12-

of litigation an employer runs when firing an employee in a protected group"). To cast doubt on Tanner's explanation in these circumstances, appellant needs to do more than simply speculate that its motive may have been sinister. This case is unlike Dominguez-Cruz, 202 F.3d at 433, where notes of the termination discussion referred to both "age" and "age discrimination" and used the word "cover-up."

Thus, even if Tanner's articulated rationale for firing appellant were unsubstantiated and unpersuasive, appellant would have fallen short in his effort to prove that the termination was a product of age discrimination. Here, however, the company's explanation for its decision is without meaningful contradiction. Appellant attempts to discredit the company's reliance on the distraction of his real estate project, but fails to generate a genuine dispute about the honesty of the company's belief that he was neglecting his duties in favor of that interest or to adduce any evidence of stereotyping. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45-46 (1st Cir. 2002) (focus must be on the perception of the decisionmaker subject to the refinement that in particular instances, e.g., stereotyping, an employer's good-faith belief is not automatically conclusive). Accord Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 29 (1st Cir. 2002). He merely hypothesizes an elaborate scheme in which the company's original intent to fire him in August, when Horne and Treu visited Boston, was frustrated by his willingness to repair the identified problems with his work, requiring the company to devise an alternative

pretextual basis for dismissal. But as an at-will employee, appellant could have been terminated without being provided any opportunity to remedy the deficiencies cited by the company; that he was not fired in August based on Horne's list of concerns supports the company's assertion that the discharge stemmed from its discovery of new information.[5]

Moreover, it is undisputed that the sequence of events directly leading to appellant's termination began with an unsolicited call from Prew, whose report of deficient performance was seemingly substantiated by objective sources: (1) a number of newspaper articles showed various aspects of the ongoing story of appellant's real estate venture, and (2) two headquarters employees with no personal stake in appellant's future confirmed his lesser involvement with the main office. These reports certainly do not prove that appellant was neglecting his duties, and one could criticize the decision not to allow him to respond, simply as a

_____

[5] Appellant argues that Tanner's quick turnaround from allowing him to improve to firing him shows that the company was "motivated to accept uncritically any new reason to accomplish the termination," and he cites Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168-69 (1st Cir. 1998), for the proposition that a court assessing discriminatory motive may consider "the specific sequence of events leading up to the challenged decision." We agree with his legal proposition, but disagree that it assists his claim.

First, even if the company's change in position were suspicious, it would not be probative of age-based animus. See Zapata-Matos, 277 F.3d at 45 ("[T]he ultimate question is not whether the explanation was false, but whether discrimination was the cause of the termination."). Second, a sudden change of heart by the company is consistent with its expressed reason for the discharge. Although Tanner had decided to give him a chance to improve, when "confirmation" of his deficient performance and the "explanation" for it appeared, the company plausibly could have leapt to the conclusion -- perhaps unfairly -- that he had deceived them.

courtesy, after nearly twenty years of mostly excellent performance. The failure to do so, however, does not prove -- or even suggest -- age bias.

Appellant essentially argues that the various wisps of age-related evidence, woven together and viewed in his favor, are enough to permit a jury to find in his favor. We cannot agree. The references to age have virtually no probative value, and the objective evidence substantiates the company's asserted justification.[6] Although the record would permit a jury to conclude that the company wrongly attributed changes in appellant's work patterns to his involvement with the real estate project, it would not permit a finding that that rationale served as a pretext for age discrimination. Cf. Santiago-Ramos, 217 F.3d at 56 (a plaintiff can demonstrate pretext by identifying "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons'") (internal citation omitted).[7] Without meaningful indicators of age-based

_____

[6] Appellant's contention that Tanner's explanation for the termination shifted over time is without support in the record. The company consistently attributed its decision to appellant's involvement with the real estate project and his failure to discuss the project at the August meeting with Horne and Treu. See, e.g., App. at 20-21, 305-06, 361-64, 376-78. Appellant's assertion, unsupported by documentary evidence, that the company "focused" on his sales performance before the Massachusetts Commission Against Discrimination does not create a contradiction in the company's statements.

[7] Appellant misfires in criticizing the district court for attributing his termination to the company's desire to retain Mercer while failing to recognize that a jury must make a factual finding on the reason for that preference. The district court did not make any finding on the reason for termination. It simply accepted appellant's own assertion that the company fired him because it preferred Mercer, and concluded that there was

animus, and in the absence of evidence to undercut the company's credibility, summary judgment for Tanner was proper.

The judgment of the district court is affirmed.

---

insufficient evidence of age bias to warrant a jury determination.