**Gary S. WEBBER, Plaintiff,**

v.

**INTERNATIONAL PAPER COMPANY, Defendant.**

No. 02–63–B–S.

United States District Court, D. Maine.

June 9, 2004.

cordingly, I find that September 15 is the proper accrual date.

Arthur J. Greif, Gilbert & Greif, P.A., Julie D. Farr, Gilbert & Greif, P.A., Bangor, ME, for Gary S. Webber.

Jonathan P. Harmon, McGuire, Woods, Richmond, VA, Kate S. Debevoise, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, Peter M. Weatherbee, Weatherbee, Woodcock, Burlock and Woodcock, Bangor, ME, Vincent J. Miraglia, McGuire Woods LLP, Washington, DC, for International Paper Company.

ORDER ON PLAINTIFF'S MOTION TO AMEND AND DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL

SINGAL, Chief Judge.

Plaintiff Gary Webber sued International Paper Company ("IP") alleging that his dismissal as part of a reduction in force was motivated by his disability, in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551–4634. The action was removed to federal court based on diversity jurisdiction. At trial, a jury found for Mr. Webber and awarded compensatory and punitive damages, which the Court subsequently reduced to $300,000 compensatory damages pursuant to 5 M.R.S.A. § 4613(2)(B)(8). Finding that Mr. Webber removed himself from the labor market at the end of 2001, this Court awarded Mr. Webber back pay of $27,384.02, plus prejudgment interest.

Presently before the Court are IP's renewed motion for judgment as a matter of law and motion in the alternative for a new trial (Docket # 122) and Mr. Webber's motion to amend the findings of fact and conclusions of law relating to back pay (Docket # 121). For the reasons set forth below, the Court GRANTS both IP's motion for judgment as a matter of law and its alternative motion for a new trial; Mr. Webber's motion to amend is rendered MOOT.

## I. FACTS

In deciding a renewed motion for judgment as a matter of law, the Court must look at the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir.2003). The Court must not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Id.* The Court reviews the record as a whole, but disregards "all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In the light most favorable to Mr. Webber, the facts relevant to IP's renewed motion for judgment as a matter of law are as follows. From the early 1980s until he was laid off in July of 2001, Mr. Webber worked at the Bucksport mill in Bucksport, Maine. The Bucksport mill manufactures coated paper for use in magazines and catalogs. At the time of Mr. Webber's termination, the Bucksport mill was owned and operated by Defendant International Paper. In the summer of 2001, International Paper instituted a corporation-wide reduction in force dubbed "Functional FAST," with the objective of reducing by three thousand the number of "corporate overhead" positions (those positions not directly involved in the manufacture of paper).

On June 15, 2001, Fred Oettinger, the manager of the Bucksport mill, met with Roger Purlington, IP's coated paper manufacturing director, and Bill Pierre, the human resources director for coated paper mills, both of whom worked at IP's Memphis offices. Also present at the meeting were Jeff Hamilton, the mill's operations manager, and David Libby, the mill's human resources manager. Serge Sorokin, in training to replace Mr. Purlington, participated from Memphis via telephone. At the meeting, Mr. Oettinger was directed by his superiors to eliminate twenty-one positions at the mill, including eight engineers. He was further advised that the Bucksport mill employed ten mechanical project engineers whereas comparable mills employed only six; he was instructed

to pare down the number of project engineers.

Mr. Oettinger decided to reduce the number of project engineers by two, to a total of eight. Of the project engineers, Mr. Oettinger decided to eliminate the positions of Mr. Webber and Wayne Jacobs. Mr. Oettinger testified that he selected Mr. Webber because he did not have an engineering degree and was not capable of working on the high-end engineering projects directly related to the manufacture of paper. Mr. Webber acknowledged that he was less qualified than other project engineers and that there were indeed projects that he was not qualified to do. Mr. Webber only identified one project engineer, Wayne Jacobs, whom he believed to be less qualified than he. Notably, Mr. Jacobs was laid off the same week as Mr. Webber.

Most individuals whose positions were eliminated as part of Functional FAST were notified of their termination on Monday, June 25, 2001. On June 22, Mr. Oettinger told Larry Schaub, the engineering manager, and Stephen Moser, the maintenance engineer manager, about his decisions regarding the termination of project engineers. The undisputed testimony indicates that Mr. Oettinger had already made his decision before he spoke with Mr. Schaub and Mr. Moser. Neither acted to save Mr. Webber's job.

On the morning of June 25, 2001, Mr. Webber met with Mr. Oettinger and Mr. Libby, and was informed that his position was being eliminated and his employment terminated. When Mr. Webber asked why he had been chosen, Mr. Oettinger told him that it was because of the quantity and quality of his work, and that his capabilities were limited by the fact that he did not have an engineering degree.

Mr. Webber suffers from problems with his knees, which have necessitated several surgeries since 1997. As a result of his knee troubles, Mr. Webber's mobility is limited, and he walks with a cane. His knee surgeries have sometimes required extended absences from work. Following the advent of his knee difficulties, IP accommodated each of his requests related to his disability. Mr. Webber was permitted to park his car inside the mill, something that no other employee (including the mill manager) did. He received permission to use the freight elevator in the main office building, where his workstation was located, and stair glide chairs were installed in the main office building and the employee development center building at Mr. Webber's request. Mr. Schaub permitted Mr. Webber to work from home, and IP provided a laptop computer for that purpose. Mr. Schaub also worked with Mr. Webber to allow him to work a part-time schedule while recovering from a knee surgery. Mr. Schaub assigned some physical aspects of Mr. Webber's job to other employees. Finally, Mr. Webber was reassigned from an office on the third floor to an office on the first floor at his request.

The comments presented by Mr. Webber to support an inference that he was terminated because of disability discrimination are as follows: (1) an unattributed maxim that Mr. Webber heard during his time at the mill that "salaried people do not get hurt"; (2) a comment made by Steven Finley (then one of Mr. Webber's supervisors) in December 1997 that if Mr. Webber lost twenty pounds, he would have fewer problems with his knee, at which Mr. Finley and Mr. Schaub laughed; (3) the description of a stair-glide chair installed to help Mr. Webber reach his work station as a "Costanza chair" by Mr. Moser, Mr. Schaub (Mr. Webber's second-line supervisor) and Tom Thompson (Mr. Webber's first-line supervisor), in reference to an episode of the television show "Sein-

feld" in which the character George Costanza fakes a disability; (4) a discussion with Dr. Read, the mill doctor, in January or February of 2001, two weeks before a scheduled knee surgery, at which Dr. Read suggested that Mr. Webber should go home to avoid injuring himself at the mill; (5) an inquiry by Mr. Thompson in May or June of 2001 as to how long it would take for Mr. Webber's knee to heal; and (6) a comment by Mr. Thompson on June 25, 2001, just before Mr. Webber was notified of his termination (but after the decision to terminate his employment had been made), that "you're the weakest link, you're gone."

Mr. Webber also attempts to infer discriminatory animus from: (1) the mill manager's efforts to reduce work-related "lost-time" injuries; (2) the fact that Mr. Webber can do most of the tasks currently being performed by project engineers at the mill, even without a degree; (3) IP's failure to offer Mr. Webber employment in a different position at the mill when his position was eliminated; and (4) evidence that Dale Wibberly (an employee in the mill's human resources department) had suggested to one of his superiors that Mr. Webber be removed from the list of employees to be laid off because he was not yet back full-time following a knee surgery.

## II. THE MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Overview

■ The Maine Human Rights Act prohibits employers from, *inter alia*, "discriminat[ing] against a qualified individual with a disability because of the disability of the individual in regard to [the] . . . discharge of employees." 5 M.R.S.A. § 4572(2). "[B]ecause the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74 (Me.1993) (quoted in *Doyle v. Dep't Human Servs.*, 824 A.2d 48, 54 n. 7 (Me.2003)). The parties stipulated that Mr. Webber was "a qualified person with a disability within the meaning of the Maine Human Rights Act." As a result, the only remaining issue for trial was whether Mr. Webber's termination was the product of illegal discrimination based on his disability.

■ The question before the Court in a motion for judgment as a matter of law is whether the facts and inferences are such that no reasonable factfinder could have reached a verdict against the movant. *See Santos v. Sunrise Med., Inc.*, 351 F.3d 587, 590 (1st Cir.2003). Because Mr. Webber presents only circumstantial evidence of discrimination, the sufficiency of his claim is evaluated using the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Me. Human Rights Comm'n v. Auburn*, 408 A.2d 1253, 1261–62 (Me.1979). In the initial step, Mr. Webber must establish a prima facie case of discrimination. The prima facie case is "a small showing that is not onerous and is easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir.2003) (internal quotations and citations omitted). It creates an inference of discrimination, which "fades away" when the employer offers a non-discriminatory reason for the employment action in question. *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir.2003). Once the employer has offered an alternative reason for the adverse employment action, "[a]ll that remains is for the plaintiff to show that the adverse employment action was the result of discriminatory animus." *Id.*

The Court assumes, without deciding, that Mr. Webber established a prima facie case of disability discrimination against IP.[1] Based on this assumption and IP's proffer of a nondiscriminatory reason for terminating Mr. Webber (the company-wide reduction in force, combined with his lack of an engineering degree), the *McDonnell Douglas* framework is left behind, and the Court focuses on the central issue in this case: whether a reasonable jury could have concluded that Gary Webber was included in the July 2001 reduction in force because of his disability. *Cf. Conway v. Electro Switch Corp.*, 825 F.2d 593, 599 (1st Cir.1987) (noting that "in any sex discrimination case, the ultimate issue is whether the defendant intentionally discriminated against the plaintiff on the basis of sex").

IP explained that Mr. Webber was among those discharged in the July 2001 reduction in force because it had been determined that two project engineer positions would be eliminated, and Mr. Webber was one of the two least-qualified project engineers. Mr. Webber had the burden of proving by a preponderance of the evidence that this was (1) not the real reason for his termination, and (2) that the actual reason for his termination was discrimination on the basis of his disability. *See Reeves*, 530 U.S. at 146–47, 120 S.Ct. 2097; *Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir.2002).

As explained below, the Court concludes that no reasonable factfinder could find that IP's proffered reason for Mr. Webber's termination was pretextual, and that even assuming the proffered reason was pretext, no reasonable factfinder could find that Mr. Webber's termination was the product of disability discrimination.

## B. Pretext

In order to create a question of fact as to pretext, Mr. Webber must do more than discredit the rationale behind his selection for the reduction in force: he must generate a genuine dispute about the honesty of the company's assertion that he was selected because he was among the least-qualified employees in a project engineer position. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir.1996) ("The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same."), *quoted in Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir.2000). This he has not done.

**1. Discriminatory Comments.** One way of creating a question of fact as to pretext is to show discriminatory comments made by the key decisionmaker or one in a position to influence the decisionmaker. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir.2000). Although Mr. Webber argues that the evidence of various comments made to him over the years of his employment allows an inference of pretext, none of these comments is adequately tied to the decisionmaker to allow such an inference.

Mr. Webber agreed that there was no evidence that Mr. Oettinger, the key decisionmaker, harbored any discriminatory animus, and there was no showing of dis-

---

1. The Court notes that IP may have waived its argument that Mr. Webber failed to establish a prima facie case by failing to include the argument in its initial motion for judgment as a matter of law pursuant to Rule 50(a). *See*

*Larch v. Mansfield Mun. Elec. Dept.*, 272 F.3d 63, 72 (1st Cir.2001) (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (2d ed.1994)).

criminatory animus on the part of any of the individuals involved in the decision-making process (Mr. Purlington, Mr. Pierre, Mr. Hamilton, Mr. Libby, and Mr. Sorokin).[2] Mr. Webber made no argument that the reduction in force itself, or the decision to reduce the number of project engineers by two, was motivated by discriminatory animus. Mr. Webber is left with a mixed bag of statements about his knees made over the course of his employment, which he hopes will somehow impart discriminatory animus to a decision made by a non-discriminatory decisionmaker. This approach cannot succeed.

The only comments that Mr. Webber even argues could be related to the decisionmaking process are the comments of Mr. Schaub and Mr. Moser. It is true that an employer may be held liable for employment discrimination where the decisionmaker harbored no discriminatory animus, but made the decision based on false or misleading information provided by an employee who did harbor such animus. *Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 87–88 (1st Cir.2004). However, even if the temporally remote and non-employment-related comments of Mr. Schaub and Mr. Moser could be construed as evidence of discriminatory animus, there is no evidence that Mr. Schaub and Mr. Moser provided negative information to influence Mr. Oettinger's decision to include Mr. Webber in the reduction in force, or failed to correct misunderstandings of fact held by Mr. Oettinger. Although Mr. Schaub and Mr. Moser were informed of Mr. Webber's impending termination, they took no action. A discriminator's failure to disagree with a superior's non-discriminatory termination decision cannot breathe discriminatory intent into

an otherwise innocuous employment action. To hold otherwise would allow every plaintiff who could produce evidence of another employee's discriminatory animus to impute that animus to a decisionmaking process in which the discriminatory individual played no part, but could have. This would undermine the requirement that the plaintiff show that the disability "was *the determining factor* in an adverse employment action." *Patten v. Wal–Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir.2002) (emphasis in original); *see also Doyle v. Dep't Human Servs.*, 824 A.2d at 54. It would also prevent an employee who knew that she could not make nondiscriminatory decisions about another employee from recusing herself from decisionmaking about that employee, a result clearly contrary to the purpose of the MHRA.

Having reviewed all the comments relied upon by Mr. Webber, it is clear to this Court that there is no evidence to tie the allegedly discriminatory comments to Oettinger's decision, and consequently those comments do not tend to show that the proffered reason for Mr. Webber's termination was pretextual.

**2. Weaknesses or Implausibilities in the Employer's Explanations of the Termination Decision.** A second way of creating a question of fact as to pretext is by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d at 56 (internal quotations omitted). IP main-

---

**2.** Thus, any of these individuals' mere knowledge of Mr. Webber's disability is not proba-

tive of pretext or discrimination.

tained that Mr. Webber was included in the reduction in force because of the general cost-cutting measures imposed by Functional FAST, combined with the fact that he was the only project engineer without an engineering degree, making him less qualified than other project engineers. Mr. Webber attempted to contradict this explanation by arguing that the mill now outsources most of the projects that he is not qualified to manage. Mr. Webber characterizes this outsourcing as "strong circumstantial evidence that Defendant's proffered reason for Mr. Webber's termination . . . is pretextual." This characterization is unmerited. An employee is not permitted to substitute his own judgment as to his qualifications for those of his employer. *See Shorette v. Rite Aid of Me., Inc.,* 155 F.3d 8, 15 (1st Cir.1998) ("It is well settled . . . that a plaintiff's own opinions about [his] work performance or qualifications do not sufficiently cast doubt on the legitimacy of [his] employer's proffered reasons for its employment actions.") (quoting *Ost v. W. Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 441 (7th Cir.1996)). IP was permitted to terminate Mr. Webber on any legal ground, including his professional qualifications. The fact that Mr. Webber may still have been able to do his job does not merit the inference that the reason proffered by IP for selecting Mr. Webber for termination was false. *See Smith v. F.W. Morse & Co.,* 76 F.3d 413, 423 (1st Cir.1996) ("The elimination of a position signifies the employer's belief that it can get by with one less helper; it does not necessarily convey a belief that the work the employee had been doing was superfluous and need not be performed at all.").

Neither has Mr. Webber shown any inconsistencies in the rationale given for his termination; it is undisputed that he was the only person without an engineering degree to be employed as a project engineer, and Mr. Webber was unable to identify any retained project engineer who was less qualified than he. Indeed, Mr. Webber recognized that an engineering degree was listed as "required criteria" in the project engineer job description.

██ Mr. Webber places great weight on the fact that he was not transferred to the position of SQA Coordinator, a position he had previously sought and which was not filled at the time of his termination. However, an employer is not obligated to offer an employee a transfer or relocation during a reduction in force. *See Pages–Cahue v. Iberia Lineas Aereas de Espana,* 82 F.3d 533, 539 (1st Cir.1996). Absent other evidence that Mr. Webber was included in the group of laid-off employees based on discriminatory animus, the failure to offer him an unoccupied position during a period of downsizing does not lead to the conclusion that the reason proffered by IP was untrue, or that his termination was based on discriminatory animus. At most, it would constitute evidence that IP did not want Mr. Webber as an employee, regardless of his position. *See Smith,* 76 F.3d at 422 ("There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII even though those positions are held by members of protected groups.").

In what is arguably his strongest attempt to establish a question of fact as to pretext from the evidence presented at trial, Mr. Webber attempts to tease an inference of disability discrimination from Mr. Oettinger's explanation, at the June 25, 2001 meeting, that Mr. Webber was being let go because of the quality and

quantity of his work.[3] This effort is unavailing, for as Mr. Webber emphasizes in his memorandum, Mr. Oettinger did not review any of Mr. Webber's performance evaluations, look at any of the projects Mr. Webber had contributed to, or speak with any of Mr. Webber's supervisors before making his decision. (In the course of his job as mill manager, Mr. Oettinger reviewed all expenditures over $10,000, and was generally familiar with the types of work performed by different project engineers.) The fact that no complaints were made about the quality and quantity of Mr. Webber's work prior to his termination does not reveal a weakness or implausibility in IP's explanation that he was let go because he was one of the least qualified engineers. Viewing the record as a whole (including the strong evidence supporting IP's proffered reason for Mr. Webber's termination) in the light most favorable to Mr. Webber, Mr. Oettinger's statement can only mean that Mr. Webber could not do certain work because of his professional qualifications. It does not allow the inference that IP's proffered reason was false or that Mr. Webber's termination was based on his disability or his attendant leaves of absence.

Based on the foregoing discussion and its review of the record, the Court concludes that Mr. Webber did not create a question of fact as to whether IP's proffered reason for his termination was pretextual.

## C. Discrimination.

 Assuming *arguendo* that the evidence introduced in this case was sufficient for a reasonable factfinder to conclude that the reasons given for Mr. Webber's termination were pretextual, there is insufficient

evidence for a reasonable jury to find that the true reason for Mr. Webber's termination was disability discrimination.

Even if Mr. Webber could establish pretext, there is a dearth of evidence from which a reasonable factfinder could conclude that the real reason for his termination was his disability. "[P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 146–47, 120 S.Ct. 2097 (internal quotations and punctuation omitted). *Reeves* explained that although a plaintiff in an employment discrimination case must prove both that the employer's proffered reason for terminating the employee was false and that the reason offered is a pretext for discrimination, the falsity of the proffered reason may permit the inference that the actual reason for the employment action in question was illegal discrimination. 530 U.S. at 147, 120 S.Ct. 2097. However, the *Reeves* court clarified that this is not always the case:

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was un-

---

**3.** On the date he was terminated, Mr. Webber was working part-time as he transitioned

back into the workplace after a knee surgery.

true and there was abundant and uncontroverted evidence that no discrimination had occurred.

*Id.* at 148, 120 S.Ct. 2097 (emphasis in original). In this case, the evidence is conclusive that Mr. Webber was included in the reduction in force because of his lack of professional qualifications: there was no showing that Mr. Oettinger or any of the other decisionmakers involved harbored discriminatory animus,[4] and no suggestion that the decision to eliminate two project engineer positions was influenced by impermissible discrimination. It is undisputed that Mr. Webber was less qualified than the retained project engineers.

The comments relied on by Mr. Webber either lack temporal proximity to the decision to terminate his employment, are "textbook example[s] of [ ] isolated remark[s] which demonstrate[ ] nothing," *see Shorette v. Rite Aid of Me., Inc.,* 155 F.3d at 13, or show no evidence of discriminatory mindset. The comments were in no way tied to the conditions of employment or Mr. Webber's qualifications for such employment. Moreover, the accommodations made for Mr. Webber's disability are inconsistent with a bias against disabled employees. *Cf. Smith v. F.W. Morse & Co.,* 76 F.3d at 423 (noting that promotion and increase in compensation in advance of six-week maternity leave were "inconsistent with a bias against pregnant employees.")

Even if the comments made by Mr. Schaub and Mr. Moser could be attributed to the decisionmaking process in spite of Mr. Schaub and Mr. Moser's mere acquiescence in Mr. Oettinger's decision, they do not allow an inference that the true reason for Mr. Webber's termination was animus towards persons with disabilities. First, Mr. Schaub's reaction to the comment regarding weight loss almost four years before Mr. Webber's termination is too remote in time to have any probative value with respect to the reason for Mr. Webber's termination. *See McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals,* 140 F.3d 288, 300–301 (1st Cir.1998) (noting, while upholding the district court's admission of certain evidence, that "stray remarks may properly constitute evidence of discriminatory intent for the jury to consider in combination with other evidence," but that "even if the remarks are relevant for the pretext inquiry, their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision . . . or if they were not related to the employment decision in question or were made by nondecisionmakers.") Even if the suggestion that Mr. Webber lose some weight were close enough in time to have some probative value, that value would be undermined by the fact that the comment did not exhibit hostility toward Mr. Webber's disability, or involve his employment at all. *See Straughn v. Delta Air Lines, Inc.,* 250 F.3d 23, 36 (1st Cir.2001) ("Although *statements directly related to the challenged employment action* may be highly probative in the pretext inquiry, mere generalized 'stray remarks,' arguably probative of *bias* against a protected class, normally are not *probative of pretext* absent some discernible evidentiary basis for assessing their temporal and contextual relevance.") (emphasis in original) (internal

---

4. Mr. Webber attempts to infer discriminatory animus from the mill manager's efforts to reduce work-related injuries and "lost-time" injuries. The mere fact that an employer takes steps to promote workplace safety does not allow the factfinder to infer that the employer harbors animus towards people with disabilities. Moreover, Mr. Webber's claim is based on disparate treatment, not disparate impact, and as such, he must produce evidence that he was terminated because of his disability.

citations omitted). Second, as for the "Costanza chair" comments about the stair glide chair, even assuming the worst (as the Court is obligated to), these comments would indicate that Mr. Schaub and Mr. Moser thought that Mr. Webber was feigning a disability, not that he was an undesirable employee because he had a disability.

The remaining comments consist of remarks that were not even arguably linked to decisionmakers or the decisionmaking process. Thus, any probative value they might have toward showing the true reason for an employment action is slight. *See Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 100–01 (1st Cir.2002) (describing questions about an employee's retirement plans as "brief, stray remarks unrelated to the termination decisional process," noting that there was "no accompanying suggestion that [the plaintiff's] value to the company had diminished because of his age," and stating that the effect of the comments by prior supervisors on the strength of the plaintiff's case was "circumscribed—if not entirely negated—by the fact that neither of them played a role in the termination."); *Santiago–Ramos*, 217 F.3d at 55 ("Typically, statements made by one who neither makes nor influences a challenged personnel decision are not probative in an employment discrimination case.") (internal quotation omitted). Even assuming the maxim that "salaried people do not get hurt" was generally attributable to the mill management, the statement does not indicate a distaste for or a devaluation of persons with disabilities. At the very worst, it could be taken to mean that salaried employees should not report work-related injuries.

To sum up, even if there were sufficient evidence from which a jury could conclude that the reasons offered by IP for Mr. Webber's termination were untrue, Mr. Webber simply did not present enough evidence to allow an inference that the true reason for his dismissal was disability discrimination. *See Zapata–Matos*, 277 F.3d at 47 ("[T]he slight suggestion of pretext present here, absent other evidence from which discrimination can be inferred [does not meet] plaintiff's ultimate burden.")

## III. THE MOTION FOR A NEW TRIAL

■ A motion for a new trial involves greater discretion on the part of the district court: such a motion may be granted only if "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 375 (1st Cir.2004). In the exercise of that discretion, and in light of the foregoing discussion, the Court alternatively holds that IP would be entitled to a new trial in the event that the ruling of this Court granting the motion for judgment as a matter of law is reversed.

## IV. CONCLUSION

While Mr. Webber has plenty of concerns about the way in which he was terminated, this Court "do[es] not assume the role of a super personnel department, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Ruiz*, 124 F.3d at 250 (internal quotations omitted). "[I]nsofar as Title VII [and by extension, the MHRA] is concerned, an employer can hire or fire one employee instead of another for any reason, fair or unfair, provided that the employer's choice is not driven by race, gender, pregnancy, or some other protected characteristic." *Smith*, 76 F.3d at 422. In the absence of any evidence connecting the decision to eliminate his position to

discrimination against persons with disabilities, the Court GRANTS IP's Motion for Judgment as a Matter of Law.

Alternatively, the Court GRANTS International Paper's Motion for a New Trial. Because Mr. Webber is not entitled to back pay where the jury verdict rendered in his favor is contrary to law, his motion to amend this Court's Findings of Fact and Conclusions of Law is rendered MOOT.

SO ORDERED.