# United States Court of Appeals
## For the First Circuit

No. 04-1796

GARY S. WEBBER,

Plaintiff, Appellant,

v.

INTERNATIONAL PAPER COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lipez, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.

Arthur J. Greif, with whom Julie D. Farr and Gilbert & Greif, P.A. were on brief for appellant.
Jonathan P. Harmon, with whom McGuire Woods LLP was on brief for appellee.

August 9, 2005

**CYR, <u>Senior Circuit Judge</u>.** Gary S. Webber appeals from the district court judgment which was granted to his former employer, International Paper Company ("IP"), as a matter of law notwithstanding the jury verdict which Webber obtained on his state-law disability discrimination claim. We affirm the district court judgment.

**I**

**<u>BACKGROUND</u>**

We relate the record evidence, and all reasonable inferences therefrom, in the light most consistent with the jury verdict. <u>See</u> <u>Crowley</u> v. <u>L.L. Bean, Inc.</u>, 303 F.3d 387, 393 (1st Cir. 2002). From 1983 and until his termination in 2001, Webber was a mechanical draftsman for IP at its paper-manufacturing mill in Bucksport, Maine. In 1986, he was promoted to the position of "engineer," a job description which required an engineering degree, which Webber did not possess. In 1989, Webber was assigned to oversee a $1.3 million construction project at the mill site consisting of a chemical storage facility.

In 1997, Webber injured his knee while working temporarily as a forklift operator. Surgery was required. Over the years, Webber had heard other unspecified employees say that "salaried people do not get hurt." During his post-surgery convalescence, Webber's then-immediate supervisor, Stephen Finley, told Webber that his knee might heal faster if he lost twenty

-2-

pounds. Finley and another supervisor, Lawrence Schaub, laughed at Finley's remark. Webber returned to work one month later. In 1999, he resumed his former duties as a project engineer, despite the fact that his mobility was severely restricted, necessitating his use of a cane.

Webber requested that IP provide him with several accommodations, including permission to work from his home, reduced work hours, special parking privileges, reassignment from a third-floor to a first-floor office, and the installation of a "glide chair" which would permit Webber to ride from his first-floor office to the third-floor engineering department. IP granted all of these requests. Another supervisor, Steve Moser, dubbed the glide chair "the Costanza chair," a reference to a character from a popular television sitcom who used a glide chair to feign a work disability.

In January 2001, Webber underwent total knee-replacement surgery. One month later, a reduction-in-force plan, called "Functional Fast," was instituted by IP's national headquarters, which would result in the elimination of 3000 employees nationwide. In May 2001, Thomas Thompson, Webber's immediate supervisor, asked him how long it would be before his knee healed.

In June 2001, Fred Oettinger, the Bucksport mill manager, learned that the overall workforce was to be reduced by 21 positions, which was to include an eight-employee reduction in

"technical" (viz., non-manufacturing) staff (viz., from 47 to 39). IP's national office in Memphis informed Oettinger that other IP mills of comparable size employed only six project engineers, whereas Bucksport had ten. Rather than eliminate four project engineers, however, Oettinger decided to cut only two positions.

Following consultations with the national office, Oettinger eventually selected Webber and Wayne Jacobs for termination. Oettinger notified supervisors Schaub and Moser of the decision on Friday, June 22, 2001. Neither Schaub nor Moser voiced objection. On the following Monday, Thompson approached Webber and informed him: "you're the weakest link, you're gone." Thereafter, Oettinger summoned Webber to a meeting, at which Webber was notified of his termination. Adverting to the "quality and quantity" of Webber's work, Oettinger explained that he had based his termination decision on the fact that Webber was the only one of the ten engineers without an engineering degree, thus was less capable than the other engineers of handling more complex engineering projects.

In August 2001, Webber submitted a disability-based employment discrimination claim against IP with the Maine Human Rights Commission (MHRC), received a right-to-sue letter, and commenced the instant diversity action in federal district court, alleging that IP had violated the Maine Human Rights Act, Me. Rev. Stat. Ann. ch. 5, § 4551 et seq. The district court denied the

-4-

pretrial motion for summary judgment submitted by IP, as well as its pre-verdict motion for judgment as a matter of law.  In due course, a jury returned a $3 million verdict against IP.

Thereafter, however, the district court granted IP's renewed motion for judgment as a matter of law and vacated the jury verdict, citing the insufficiency of Webber's evidence as to IP's discriminatory animus.  Webber v. Int'l Paper Co., 326 F. Supp. 2d 160 (D. Me. 2004).  Webber appeals from the judgment.

## II

## DISCUSSION

### A.    Standard of Review

A district court judgment entered as a matter of law is subject to de novo review, which requires that we view all the evidence, reasonable inferences, and credibility determinations in the light most favorable to the nonmoving party (viz., Webber).  See Vazquez-Valentin v. Santiago-Diaz, 385 F.3d 23, 29-30 (1st Cir. 2004); Fed. R. Civ. P. 50(b).  Moreover, we will affirm the ruling only if we determine that the record, thus viewed, strongly and overwhelmingly points to but one conclusion – that no reasonable jury would have reached a contrary result.  See Vazquez-Valentin, 385 F.3d at 29-30.  Although the standard for setting aside a jury verdict is plainly "stringent," plaintiff-appellant Webber – who bears the ultimate burden of proof – must have adduced more than a "mere scintilla of evidence" supporting the elements of his state-

law claim, id., and cannot prevail where the verdict necessarily rests upon evidence which is overly speculative or conjectural. See Ricci v. Alternative Energy Inc., 211 F.3d 157, 162 (1st Cir. 2000).

## B.  **Prima Facie Evidence**

As Webber adduced no direct evidence of discriminatory intent, see Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1128 (1st Cir. 2000) (describing the stringent requirements of a "mixed-motive" case), his case was subject to the so-called McDonnell-Douglas paradigm.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999). Accordingly, Webber was required to establish a prima facie case of discrimination, by adducing competent evidence that (1) he was a member of a protected class (viz., "disabled"); (2) he satisfied his employer's legitimate job performance expectations; (3) his employer terminated him; and (4) his employer did not accord similar treatment to persons outside the protected class.  See Thorndike v. Kmart Corp., 35 F. Supp. 2d 30, 33 (D. Me. 1999) (MHRA); accord Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 184 (1st Cir. 2000).  Once the plaintiff succeeds in establishing a prima facie case, his employer must shoulder the burden to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination.  See Reeves, 530 U.S. at 142.  Once the

-6-

employer satisfies that minimal burden of production, the plaintiff must bear the ultimate burden of adducing sufficient evidence from which a factfinder rationally might infer that the employer's articulated reason is a pretext for discrimination, and that the real reason for the termination was discriminatory animus. See id. In this endeavor, "'many veins of circumstantial evidence . . . may be mined' . . . [and] [t]hese include – but are by no means limited to – evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence." Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004) (citation omitted).

The district court assumed arguendo that Webber had satisfied his initial burden to establish a prima facie case, shifting to IP the burden of production, see, e.g., Hall v. Giant Food, Inc., 175 F.3d 1074, 1079 (1st Cir. 1999), and on appeal, Webber does not contend that he established a prima facie case. Instead, he urges three grounds for determining that the issue is not properly before us.

First, Webber argues that IP waived this argument by failing to include it in its motion for judgment as a matter of law. But, of course, IP is not the appellant, and we may affirm a district court judgment on any ground supported by the record on appeal. See Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001).

Second, Webber maintains that he was not required to establish that the eight engineers retained by IP were not disabled, because, unlike such obvious attributes as race or gender, disability (or lack thereof) is too difficult of proof. He cites no authority for such an exception to the fourth element; nor have we found any. Prima facie proof of coemployees' non-disability may be somewhat more fact-intensive than proof of their race or gender, but the burden is neither unreasonable nor onerous. Webber presumably had ample opportunity to discover this sort of information, and had he proffered even minimally competent testimony that the retained engineers suffered from no such disability, IP would have had the burden to counter Webber's assertions with contrary evidence, if any existed. We can discern no sound reason for excusing a claimant from adducing such straightforward evidence as part of his prima facie case.

Finally, Webber argues that the sufficiency vel non of his prima facie case was relevant only during trial, and that after the jury verdict, the question became entirely moot. See United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). However, Webber's reliance on Aikens is misplaced. During trial, the plaintiff's failure to establish a prima facie case will justify summary disposition, since the employer would not be required to shoulder its burden to articulate a nondiscriminatory reason for the plaintiff's discharge. The McDonnell-Douglas

paradigm was designed primarily as a procedural mechanism for use in cases involving no direct evidence of discrimination, in order to facilitate the orderly presentation of circumstantial evidence of discrimination. If the employer fails, however, to move for summary disposition at this procedural juncture – <u>viz.</u>, when plaintiff fails to state a prima facie case, and voluntarily assumes its burden of production, the inadequacy of plaintiff's prima facie showing, standing alone, is no longer grist for the summary judgment mill.  <u>See</u>, <u>e.g.</u>, <u>Richardson</u> v. <u>Leeds Police Dep't</u>, 71 F.3d 801, 805 (1st Cir. 1995).[1]

Webber's argument is flawed, however, because he assumes that, after trial, the total absence of <u>evidence</u> which would have comprised his prima facie case is irrelevant to the decision whether plaintiff met his burden of proof at the <u>third</u> stage of <u>McDonnell-Douglas</u>.  While the failure or weakness of a prima facie showing will not alone constitute grounds for judgment for the employer, it significantly weighs in the balance when we assess whether the plaintiff adduced sufficient evidence overall from which a jury rationally might infer that the employer's articulated reason constitutes a pretext for discrimination, and that the real reason for the termination was discriminatory animus.  <u>See</u>, <u>e.g.</u>,

---

[1]This rule would not foreclose either a trial court or an appellate court from dismissing a plaintiff's claim after assuming <u>arguendo</u> – as the district court did in the instant case – that the plaintiff made an adequate prime facie showing.  <u>See</u>, <u>e.g.</u>, <u>Hall</u>, 175 F.3d at 1079.

<u>Barnes</u> v. <u>City of Cincinnati</u>, 401 F.3d 729, 736 (6th Cir. 2005) ("Nonetheless, the evidentiary underpinnings of a plaintiff's case are not irrelevant or insulated from our examination to aid our determination whether the evidence is sufficient to support a finding of intentional discrimination."); <u>see</u> <u>also</u> <u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d 83, 89 (2d Cir. 2000).

Webber admittedly failed either to adduce evidence that the eight retained engineers were not disabled, or that IP had terminated any other disabled employee. Indeed, the undisputed evidence discloses that IP and Oettinger had an exemplary record of granting accommodations to Webber and to other disabled employees. Although arguably one might reasonably have expected that IP would come forward with evidence in the event that any of these retained engineers had been disabled, this is beside the point inasmuch as IP did not have to bear that burden of proof. Webber's attempt at a prime facie showing was not merely weak. <u>See</u> <u>Zapata-Matos</u> v. <u>Reckitt & Colman, Inc.</u>, 277 F.3d 40, 47 (1st Cir. 2002) (noting that "strength of plaintiff's prime facie case" must be weighed with "slight" evidence of pretext); <u>Ricci</u>, 211 F.3d at 162 (noting that plaintiff's case cannot rest on speculation). As Webber adduced <u>no</u> evidence from which the jury rationally could have determined whether the retained or terminated employees were disabled, he <u>completely</u> failed to carry his burden of proof on the fourth element of his prima facie case, which required that he

-10-

demonstrate that IP either retained no employees who were disabled, or terminated other employees who were disabled. Given this evidentiary gap, we next turn to Webber's other evidence of discrimination.

## C. The Evidence of Pretext

### 1. The Circumstantial Evidence of IP's Discriminatory Intent

Webber points to evidence that his supervisors – Schaub, Moser, and Thompson – had a history of making discriminatory remarks concerning his disability. For instance, Schaub laughed when another supervisor told Webber that his knee might heal faster if he lost 20 pounds. Then, after IP installed the glide chair, Moser referred to it as the "Costanza chair" – a reference to an episode in the television sitcom "Seinfeld" wherein a character had used such a chair lift to fake a disability.[2] Immediately prior to the time Oettinger notified Webber of his termination, Thompson gloated: "You're the weakest link, you're gone."

Webber concedes – as he must – an utter absence of evidence (i) that Schaub, Moser, or Thompson affirmatively conveyed any alleged discriminatory animus to Oettinger, who was the decisionmaker of record, see Cariglia v. Hertz Equip. Rental Corp.,

---

[2]Additionally, we note that Webber failed to establish when these remarks were made. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69-70 (1st Cir. 2002) (noting that the relevance of a decisionmaker's discriminatory remark wanes as the remark becomes less proximate in time to the employment decision, thus less closely related to it).

363 F.3d 77, 85 (1st Cir. 2004) (discussing lack of "infection"), or (ii) that Oettinger either independently harbored or demonstrated any discriminatory animus toward Webber. Therefore, any alleged animus on the part of Schaub, Moser, or Thompson is relevant only if they participated in or influenced the decision to terminate Webber. See Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 60 (1st Cir. 2005); Cariglia, 363 F.3d at 85; Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 253 n.2 (1st Cir. 2000).[3]

As Webber adduced no evidence that Thompson was involved to any extent whatsoever in Oettinger's decisionmaking, we need not discuss any discriminatory remarks allegedly made by Thompson.

On the other hand, a somewhat closer question is presented by the conduct of Schaub and Moser. Webber notes (i) that Oettinger consulted with Schaub and Moser three days prior to the termination, and (ii) that Moser decided to mull the issue over during the weekend. IP counters that the purported animus on the part of Schaub and Moser is irrelevant since Oettinger testified (i) that he was the only decisionmaker regarding Webber's termination, (ii) that he simply notified Schaub and Moser of his

---

[3]Webber contends that Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), modified McDonnell-Douglas so as to allow jury consideration of Schaub and Moser's "stray remarks." To the contrary, Reeves involved remarks by the decisionmaker, rather than by management personnel who were in no position either to make or influence the employment decision. Id. at 151.

final decision, and (iii) that neither Schaub nor Moser either participated in or contributed to the decision. The truth is to be found somewhere between these two characterizations, however.

Oettinger, who independently harbored no discriminatory animus, did testify that he had made up his mind to terminate Webber prior to the meeting with Schaub and Moser, and that he consulted Schaub and Moser to reassure himself that he had not overlooked any relevant facts. On the other hand, Moser testified that he thought that he could have changed Oettinger's mind had he expressed disagreement with Oettinger's decision. Thus, Moser's decision to mull over the decision during the weekend could support a reasonable inference that Oettinger expected such input. In the end, of course, Moser simply acquiesced in the Oettinger decision, and there is no evidence that Moser ever told Oettinger that Webber should be terminated. Be that as it may, we shall assume <u>arguendo</u> that, even in the absence of any such direct, affirmative communication between Oettinger and Moser, a supervisor's silence (<u>viz.</u>, his discriminatory failure to utilize the veto power conferred upon him by his employer) could constitute sufficient "participation" or "influence" to warrant imputing Moser's purported animus to IP.

The pivotal question thus becomes: whether the jury could rationally infer from these record facts that Moser conceivably "influenced" the decision to fire Webber? We conclude

that such an inference is excessively speculative to sustain the jury verdict. The Moser testimony that he "believed" that he could have changed Oettinger's mind regarding the termination not only conflicts with Oettinger's assertion that his decision was final, but even more importantly is unsupported by any other corroborative evidence of Moser's power to veto these decisions, either prior to or following Webber's termination. Furthermore, Oettinger testified that he did not seek Moser's opinion, but instead intended to ascertain whether Moser was aware of any material termination-related facts which Oettinger might have missed. Thus, had Moser intervened, he would have had to supply facts, yet Oettinger nonetheless would have remained the ultimate decisionmaker. Thus, at best the record evidence could support only a most tenuous inference that the Moser decision not to stand up for Webber proximately caused the Webber termination.

2.  **The Nondiscriminatory Basis IP Proffered for the Termination**

In explicating its nondiscriminatory basis for selecting Webber for termination, IP pointed to his lack of an engineering degree, and a consequent, relative absence of experience with sophisticated engineering projects while at IP. Webber argues on appeal that the trial evidence generated a jury question as to whether the reason articulated by IP was a pretext for discrimination, in that (i) his job description had required that he possess such a degree, yet IP let him work at IP as a project

-14-

engineer for eighteen years without a degree; (ii) IP did not establish that Webber was incapable of handling any type of engineering project which was, or conceivably might be, undertaken at IP; and (iii) Webber adduced evidence that he was better "qualified" than four of the retained engineers with degrees.

A plaintiff may establish pretext by demonstrating, inter alia, that the employer articulated a nondiscriminatory reason which had no basis in fact, did not actuate the termination, or was insufficiently weighty to motivate such a decision. See Hopkins v. Electronic Data Sys. Corp., 196 F.3d 655, 662 (6th Cir. 1999); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (noting that plaintiff may prove pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons"). Webber met none of these criteria.

As a threshold argument, Webber urges that Oettinger gave not one, but two independent reasons for the termination: (i) Webber's lack of an engineering degree; and (ii) the quality and quantity of Webber's past work performance. We do not agree.

The record discloses that Oettinger's references to "quality and quantity" were in explanation of, not in addition to, the engineering degree requirement. That is to say, Oettinger did

-15-

not use the term "quality" to imply that Webber's job performance had been deficient. Moreover, Oettinger testified that, for that very reason, he had not consulted Webber's job evaluations prior to deciding to terminate him. Instead, Oettinger stated that the lack of an engineering degree limited Webber's capacity to undertake jobs of a particular "quality," viz., more complex engineering jobs, such as those involving the development and maintenance of papermaking machinery. Webber admittedly had never undertaken jobs of that nature or complexity, whereas the eight other engineers who were retained had done so. For instance, Moser testified that Webber would have been incapable of handling 30 out of 50 engineering projects, and that these projects often had $15 million budgets. Webber's most extensive project had involved the construction of a chemical storage facility, and although the project was budgeted at $1.2 million, it did not involve the development and maintenance of papermaking machinery. Finally, Webber's other engineering experience at IP largely consisted of this same type of construction and interior design or restoration project.

Moreover, Webber contests neither the legitimacy nor the necessity of the IP decision to engage in the RIF, nor that Oettinger was compelled to eliminate some engineer positions at the Bucksport plant. See Barnes v. GenCorp, Inc., 896 F.2d 1457, 1471 (6th Cir. 1990). In addition, pursuant to the "business judgment"

rule an employer is free to terminate an employee for any nondiscriminatory reason, even if its business judgment seems objectively unwise. Fennell v. First Step Designs, Ltd., 83 F.3d 526, 537 (1st Cir. 1996) ("'We may not sit as super personnel departments assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions.'") (citation omitted). By the same token, an employee's opinion of the efficacy of an employment decision, standing alone, cannot supplant the employer's business judgment. Id.

Under the business judgment rule, the possession of a degree can be a reasonable criterion for retaining one employee over another. See, e.g., Rea v. Martin Marietta Corp., 29 F.3d 1450, 1458 (10th Cir. 1994) (college degree); Barnes, 896 F.2d at 1471 (chemistry degree). Education, after all, can be a highly significant and concentrated form of experience, and while not an infallible indicium of competence, affords an employer some objective assurance that an employee likely possesses the essential knowledge necessary to perform routine tasks in his field of expertise.

Webber nonetheless contends that he generated a jury issue by showing that IP subsequently contracted away many of its more complex engineering projects to outside engineering companies. Not only does this contention seek to second-guess Oettinger's judgment that he should retain the eight engineers who possessed

-17-

degrees, but it ignores the fact that – all things being equal – an employer wisely retains those engineers with the latent capacity to perform the most complex tasks, inasmuch as it follows that those engineers could handle all engineering requirements from the simplest to the most complex, whereas an engineer in Webber's position would not be capable of handling the complete spectrum of projects. Although IP may have had the luxury of employing non-degreed engineers like Webber to handle less complex projects prior to its 2001 reduction-in-force, it would be entirely reasonable and prudent to retain employees on its streamlined staff who could handle the maximum number of projects in the future.[4]

Finally, Webber adduced no competent evidence that four of the eight retained engineers were "less qualified" than he. On cross-examination, defense counsel asked Webber whether four specified engineers were more qualified than he, and Webber responded in the affirmative. Since defense counsel did not specifically ask him for his opinion as to the qualifications of the other four retained engineers, Webber suggests that the jury reasonably could have inferred that they were less qualified. Any such inference would be pure speculation, of course. As the party

---

[4]Given this contingency planning rationale, evidence that IP has continued to do these types of less complex engineering projects in house, while contracting out some of its more complex projects, ultimately proves immaterial. Further, Moser testified that, even when it outsourced a complex engineering project, IP nonetheless assigned an in-house engineer to manage and oversee the project.

-18-

with the ultimate burden of proof, Webber was required to adduce affirmative evidence as to the alleged inferior qualifications of these four engineers.  Even then, of course, IP persuasively may have contended that its "business judgment" as to Webber's and the four engineers' relative qualifications – rather than Webber's judgment – was entitled to considerable deference.  See Fennell, 83 F.3d at 537.

The attempt to demonstrate pretext not only fails on its own merits, but is undercut by the undisputed evidence that IP granted Webber's and other disabled employees' requests for handicap accommodations.[5]  Like the glide chair installation, many of these accommodations involved significant expense to IP.

### 3.    **Additional Evidence of Discrimination**

Webber tenders two other peripheral circumstances to establish that the articulated reason for IP's adverse employment action was a pretext.  First, Webber had heard among IP employees over the years the expression that "Salaried people do not get hurt."  Accordingly, he contends that it is reasonable to infer that this report represented a company policy designed to rid itself of employees who suffered a work-related disability.  We do not agree.

Webber failed to establish the original source of this

---

[5]Barbara Gray, an IP employee who had been diagnosed with cancer and walked with a cane, testified that IP had granted her all necessary accommodations to her disability.

expression, hence it would be speculative to infer that any such rumor was promulgated with either the knowledge or the approval of IP management. See Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 5 n.8 (1st Cir. 1998) ("The identity of the speaker often is crucial to ascertaining not only intent but any causal connection between the remark and the alleged adverse action directed against the plaintiff."); see also Hein v. All Am. Plywood Co., 232 F.3d 482, 488 (6th Cir. 2000) (noting that evidence of employer's discrimination "cannot be based on rumors"). Furthermore, the expression is ambiguous, as it also could be construed as mere recognition of the truism that salaried employees – or those not involved directly in the paper-manufacturing process and with heavy machinery – were generally at less risk for work-related injuries. See Fernandes, 199 F.3d at 583 (noting that "a statement that plausibly can be interpreted two different ways – one discriminatory and the other benign – does not directly reflect illegal animus"). The trial record afforded the jury neither a basis nor the context from which to ascertain which interpretation was more plausible.

Webber notes also that IP transferred two engineers from the engineering department to the maintenance department to prevent their termination under the RIF, yet failed to make a similar accommodation to Webber. In particular, he points out that IP could have transferred him to the open position of supplier quality

assurance (SQA) coordinator.  Once again, we do not find such evidence sufficiently probative of either pretext or discriminatory animus.  The transfer of the two engineers is irrelevant, even if we were to speculate that they were not "disabled," because both possessed engineering degrees, and IP thus had an incentive to retain their services with the company.

By the same token, Webber concedes that an employer undertaking a RIF is not required to offer an employee a transfer to another job position, see Pages-Cahue v. Iberia Lineas Aereas de Espana, 82 F.3d 533, 538-39 (1st Cir. 1996) ("Appellants cite no authority for the proposition that an employer conducting a reduction in force must offer such transfers or relocations [to lesser positions] – in fact, authority exists for the proposition that employers face no such obligation."); see also Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996) ("We emphasize that the ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a RIF."); Taylor v. Canteen Corp., 69 F.3d 773, 780 (7th Cir. 1995) ("[T]he ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a RIF; an employer incurs no duty to transfer an employee to another position when it reduces its work force for economic reasons."), but contends that Pages-Cahue is factually distinguishable because IP had a stated policy of retaining engineers (if possible) because of their value to the

company.  Webber's contention mischaracterizes the record. Oettinger testified simply that engineers were valuable to IP, and did not testify to any "policy" regarding the retention of engineers.  In any event, the applicability of such policy to Webber would be entirely speculative, in that it is unclear from the context whether Oettinger was referring only to those employees in possession of engineering degrees.[6]

## III

## CONCLUSION

Although unfortunate, the record discloses that Webber failed to meet his burden of proof to show that the proximate cause of his termination was IP's discriminatory animus.  Webber failed to offer any evidence either that the employees retained in the RIF were not disabled, or that any other terminated employees were disabled.  Moreover, he failed to show that any supervisor who allegedly made discriminatory comments was in a position to participate in or influence Oettinger's decision to terminate Webber.  Webber likewise failed to demonstrate that IP's proffered reason for the termination – the fact that Webber was the only one of ten engineers without an engineering degree – was either pretextual or designed to mask its discriminatory intent.

Accordingly, the district court decision dismissing his

---

[6]Shortly after Webber was terminated, IP offered to rehire him in the SPQ coordinator position at his previous salary, and under new supervisors, but Webber declined IP's offer.

MHRA claim must be affirmed.

**<u>Affirmed</u>**.