# United States Court of Appeals
## For the First Circuit

No. 03-1841

BERNABÉ TEJADA-BATISTA,

Plaintiff, Appellee,

v.

LYDIA MORALES, Individually and in her respective official
capacity; DOMINGO ÁLVAREZ, Individually and in his respective
official capacity,

Defendants, Appellants.

_____

JOSÉ A. FUENTES-AGOSTINI, Individually and in his capacity as
Secretary of Justice of the Commonwealth of Puerto Rico; ERNESTO
FERNÁNDEZ, Individually and in his respective official capacity;
ANTONIO FRANCO, Individually and in his respective official
capacity; CRISTÓBAL IRRIZARY, Individually and in his respective
official capacity; JOHN DOE, 97CV1430, Individually and in his
respective official capacity; and MIGUEL GIERBOLINI,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Justo Arenas, U.S. Magistrate Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Carter,[*] Senior District Judge.

_____

[*]Of the District of Maine, sitting by designation.

Camelia Fernández-Romeu, Office of the Solicitor General of the Commonwealth of Puerto Rico, Department of Justice, with whom Roberto J. Sánchez-Ramos, Solicitor General, and Kenneth Pamias-Vázquez, Deputy Solicitor General, were on brief for appellants.
Irma R. Valldejuli for appellee.

———————————————

September 20, 2005

———————————————

**BOUDIN**, **Chief Judge**.    In the district court, the plaintiff Bernabé Tejada Batista ("Tejada") recovered damages against two of his superiors in the Puerto Rico Justice Department ("PRJD") for instigating Tejada's discharge in violation of his First Amendment rights.    The underlying events are easily described; the complications arise out of governing legal doctrine.

In 1987, Tejada began working as a law enforcement agent in the Special Investigations Bureau ("the bureau") of the PRJD. After other stints, Tejada was assigned in 1995 to the bureau's organized crime division, where he operated undercover, infiltrating Dominican drug trafficking rings.    According to Tejada's later testimony, he came to be troubled by certain "irregularities": drug busts called off on the eve of arrest, without explanation; misuse of funds by another agent; and shady dealings by a government informant named Ivan Merced.

Tejada reported these concerns to Antonio Franco (his supervisor) and to the two higher officials later held liable to Tejada in this case: Domingo Alvarez (division head) and Lydia Morales (bureau director).    No action was taken in response to his complaints.    Worse still, a trafficker named Hernandez told Tejada that Merced had disclosed to gang members Tejada's identity as an undercover officer.    When Tejada so advised Franco, Franco threatened to discipline Tejada for speaking to Hernandez without authorization.

Thereafter, a hit man whom Tejada had helped put in prison was released and, Tejada believed, began to search for Tejada. Fearing for his family's safety and his own, Tejada asked Franco for a transfer out of his division. Tejada then wrote to Morales, setting forth his complaints about Merced, the threat the latter posed to investigations, and the threat posed by the hit man.

Morales responded by transferring Tejada into what Tejada described as a dead-end job at bureau headquarters, one that often left him without any work to do. After receiving a number of threatening phone calls at his home, Tejada contacted Franco and Alvarez, who did not respond to his concerns. In May 1996, Tejada was activated for National Guard duty; Morales accused him of abusing military leave and withheld his pay. Eventually, in January 1997, Tejada moved his family to Florida at his own expense.

In December 1996, Tejada, while still on leave, spoke with a reporter for the El Vocero newspaper; on December 10, a short article appeared, entitled "S.I.B. Director and Assistant Denied Agent Transfer Although His Life Was in Danger." The next day, another appeared with the title, "Domingo Alvarez of the S.I.B. Forbids Arrest in Drug Transactions." The articles touched on the problems Tejada had complained of internally; each cited Tejada as a source.

The first short article, in substance, reported that Morales and Alvarez failed to protect Tejada despite threats on his life; that when he was transferred, it was only to an "inoperative section"; that Alvarez quashed another agent's complaint by threatening a transfer like Tejada's; and that Tejada had no regular car to use while at his new job, since the bureau prohibited agents from using their private cars and claimed that there were insufficient cars available.

The second article alleged that Alvarez once suddenly and without explanation cancelled an imminent drug bust. It also said that a certain "Ivan Rodriguez"--a disguised name for the informant Ivan Merced--had blown Tejada's cover, "ruined" expensive investigations, was "negotiating drug transactions" without authorization from the bureau, and "was working for the Bureau and for the underworld." It described one investigation involving Merced as follows (in translation):

> [Tejada] alleges that the confidant ruined an investigation in which a 50 kilos (which is valued at about $250,000) transaction was going to be made and "which was going great and overnight it was ruined."

On the day the second article appeared, Alvarez sent Morales a memorandum recommending Tejada's discharge on the basis of his leaks, saying that they endangered both an investigation that was "still open" and the life of the informant. The next day, Alvarez wrote another memorandum to Morales, again recommending

discharge--this time prompted (supposedly) by an anonymous tip saying that Tejada had, in 1993, been convicted of domestic abuse. Whether Alvarez had earlier known of the conviction was disputed.

The 1993 conviction, which occurred while Tejada was on military leave, resulted from Tejada's hitting his wife, but it had been formally expunged by court order when Tejada completed a rehabilitation or "diversion" program. Alvarez's memorandum to Morales mentions the diversion program, but not that its completion entailed erasure of Tejada's conviction (even though he later testified that he knew diversion entailed expungement).

Morales, who was stepping down as bureau director, passed both of Alvarez's memoranda--one about the leaks, the other about the past conviction--to the incoming acting director (Morales's own former deputy), Miguel Gierbolini. On February 4, 1997, Gierbolini recommended to the newly appointed Secretary of Justice, José Fuentes Agostini, that Tejada be discharged for the 1993 domestic violence conviction on the ground that someone with this record should not be a police agent.

Fuentes signed Tejada's termination papers on February 27, 1997; Tejada, still on military leave, learned of this in early March, and an informal agency hearing was held on November 17, 1997. The hearing officer recommended discharge because the conduct leading to Tejada's conviction represented, in violation of the bureau's regulations, "improper behavior or [behavior] damaging

to the good name of the agency or the Government of Puerto Rico" and "commission of acts for which is charged or may be charged a felony or misdemeanor crime."

Tejada brought suit in federal district court, seeking damages and injunctive relief under section 1983, 42 U.S.C. § 1983 (2000), for violation of his First Amendment rights. Named as defendants were Fuentes, Morales, Alvarez, Gierbolini, Franco, two other supervisors named Cristobal Irrizary and Ernesto Fernández, and an unnamed PRJD employee. Defense motions for summary judgment based on qualified immunity were denied, but the court eventually dismissed the claims against Fuentes, Fernández, and Irrizary for lack of evidence to support liability.

In dismissing the claim against Fuentes, the judge said that the evidence was insufficient as to motive, as it "point[ed] to" a "very valid, nondiscriminatory reason." He later explained in a written opinion:

> Nothing in the plaintiff's evidence established that [Secretary] Fuentes Agostini's motivation for signing the termination letter was in any way related to the publication of the newspaper articles or plaintiff's denouncement of corruption.

Instead, the evidence showed that Fuentes had merely "signed the termination letter adopting a recommendation" based on Tejada's prior conviction.

As to the remaining defendants, the judge wrote that "[t]here is sufficient evidence . . . from which a reasonable trier

of fact could find in favor of plaintiff."  He noted Tejada's internal complaints of corruption, appellants' inaction, the timing of Alvarez's memoranda, the possibility that Alvarez had long known of the conviction, and Morales' role in forwarding the memoranda to Gierbolini.  In other words, the judge thought that their motive could be deemed retaliatory.

On February 27, 2003, after a four-day trial, the jury returned a verdict against Morales and Alvarez, assessing damages of $125,000 for Tejada's lost income.  The district court denied post-trial motions for judgment in favor of the defendants, a new trial, and remittitur.  Morales and Alvarez now appeal, contesting both the verdict against them and the amount of damages.

The appeal implicates several different bodies of court-created law, beginning with the cause of action itself.  Although the section 1983 cause of action is statutory, the substance of the claim here derives from Supreme Court precedents construing the First Amendment.  In a nutshell, the Pickering/Connick line of decisions forbids officials from firing an employee for "protected speech" unless under a balancing test the governmental interests outweigh the need for protection.[1]

---

[1]See Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 564, 88 S.Ct. 1731, 1732-33, 20 L.Ed.2d 811 (1968); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 281-82, 97 S.Ct. 568, 573-74, 50 L.Ed.2d 471 (1977); Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 411-13, 99 S.Ct. 693, 694-95, 58 L.Ed.2d 619 (1979); Connick v. Myers, 461 U.S. 138, 140-41, 103 S.Ct. 1684, 1686-87, 75 L.Ed.2d 708 (1983); Board of

The claim thus turns in the first instance on the nature of the speech, the balancing of interests, and the motivation for the firing. In this instance, the defendants concede for purposes of this appeal that Tejada's "speech"--his disclosures to the reporter--was at least in part protected speech under the governing case law. The disclosures, indeed, involved alleged serious mismanagement and possible corruption in the bureau, see Guilloty Perez v. Pierluisi, 339 F.3d 43, 52-53 (1st Cir. 2003), and they occurred only after Tejada had properly sought relief through internal complaints, cf. Wagner v. City of Holyoke, 404 F.3d 504, 508 (1st Cir. 2005) (per curiam).

The "balancing"--ordinarily a question of law for the court--is a much closer question. The defendants argue that Tejada potentially endangered the life of an informant (Ivan) and could have jeopardized ongoing investigations. This solicitude may appear to contrast with defendants' own limited interest in Tejada's safety. Furthermore, only Ivan's first name was revealed, and Ivan was himself in jail (for unauthorized drug dealing while acting as an informant) by the time of the newspaper reports.

Nevertheless, had Tejada been fired because he revealed information jeopardizing an informant and an ongoing investigation, defendants would have an excellent argument that Tejada was fired

County Comm'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668, 670, 116 S.Ct. 2342, 2345, 135 L.Ed.2d 843 (1996).

-9-

for unprotected speech. See United States v. Chagra, 701 F.2d 354, 365 (5th Cir. 1983). However, so far as Morales and Alvarez were responsible for the firing--a separate question to which we will return--the jury could on the evidence before it conclude that their motives were not based on these concerns about Ivan and the investigation, but that they acted because of Tejada's protected speech.

Tejada's main disclosures were of mismanagement and possible corruption; hostility to him had been demonstrated because of his internal complaints well before his newspaper disclosures; and the addition of the domestic violence charge could have been viewed as a gratuitous gesture undermining the claim by appellants that they were centrally concerned with the threat to Ivan or ongoing investigations. In short, the jury could have concluded that the appellants acted because of Tejada's protected speech.

The focus of the appellants' brief, so far as liability is concerned, is on a multi-step claim: that Fuentes, not the appellants, fired Tejada; that Fuentes did so on an entirely different ground unconnected with protected speech; and that these circumstances insulate the appellants from liability under the so-called Mt. Healthy defense, which arises where the firing would have occurred even without the protected speech. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

-10-

To start with the factual premises, we agree that Fuentes purported to discharge Tejada because of the domestic violence conviction, and for the present appeal we accept that this was indeed Fuentes's ground. This is not because the district court's ruling to this effect binds us, as appellants assert, but because there is no direct evidence that Fuentes acted on any other ground.[2] A circumstantial case to the contrary might be attempted (based on implausibility), but it would not be easy and Tejada does not attempt such an attack on appeal.

Strictly speaking, Mt. Healthy is not on point here. It deals with actions taken by an official or agency out of "mixed motives." It says, in substance, that where there was a permissible and impermissible ground for a firing, the impermissible ground should be ignored where the employee would have been discharged anyway based on the permissible motive. Although clear policy considerations are invoked, the main rationale is that in such a case the impermissible ground was not a but-for cause of the firing; it would have happened anyway. 429 U.S. at 285-87.

---

[2]Although appellants say that the dismissal of Fuentes created "law of the case" that settles the question on appeal, this reflects a basic misunderstanding of the doctrine. The branch of the doctrine invoked here is simply a prudential (but not obligatory) rule that the same court will ordinarily not revisit an earlier ruling made in the same case. See Conley v. United States, 323 F.3d 7, 12 (1st Cir. 2003) (en banc). The doctrine does not determine whether the district court's ruling as to Fuentes is correct nor bar a challenge to it on this appeal.

-11-

Thus, Mt. Healthy comports with the traditional tort-law principle that if the wrongful act did not cause the injury, the wrongdoer is not liable. See Prosser & Keeton on Torts, § 41 at 263 (5th ed. 1984). By contrast, in this case, the actions of the appellants were a "but-for" cause of Tejada's firing. The jury could easily have concluded that Tejada would not have been fired if appellants had not disclosed Tejada's prior conviction and passed along the recommendation to Fuentes. The appellants' actions were also surely a "proximate cause" as well, in the sense that the result was foreseeable (indeed, desired).

So the problem in this case is not one of a single actor with multiple motives, but of sequential actors having different motives--the first actor's motive being unlawful and the second actor's motive at least permissible. In such a case, the first actor may be (and here was) a but-for cause of the firing. The question is whether the intervening step--a final decision maker acting on a permissible ground--should as a matter of policy (not lack of causation) insulate the wrongdoer from liability.

We have found only a few circuits that have addressed this sequence-of-actors issue in the present context, and they are nominally in conflict. The Fifth Circuit says that the final action by the properly motived superior insulates the ill-motivated subordinate, Beattie v. Madison County Sch. Dist., 254 F.3d 595, 603-05 (5th Cir. 2001); three other circuits say that the

subordinate remains liable if he is a but-for cause of the firing, Gilbrook v. City of Westminster, 177 F.3d 839, 854-56 (9th Cir. 1999), cert. denied, 528 U.S. 1061 (1999); Saye v. St. Vrain Valley Sch. Dist., 785 F.2d 862, 867 (10th Cir. 1986); Hickman v. Valley Local Sch. Dist. Bd. of Educ., 619 F.2d 606, 610 (6th Cir. 1980). Whether any of these cases intends a wholly mechanical rule in all cases is open to doubt.

Our own recent decision in Webber v. Int'l Paper Co., 417 F.3d 229 (1st Cir. 2005), far from assisting appellants, appears to assume arguendo that a tainted adverse recommendation from a supervisor to a superior might create liability even if the superior's own motive was pure. Ultimately, the court did not decide the issue; it found that (unlike the present case) the superior had determined to terminate the employee on legitimate grounds before any contact with the supervisor and that the supervisor had no causal influence on the firing.

In any case, a rigid rule would not comport with sound policy.[3] Suppose that the appellants had disclosed that Tejada was taking payoffs from the mob and Fuentes had discharged Tejada on that basis; it is hard to imagine any court upholding damages to

---

[3]Section 1983, as we have already noted, provides only a skeletal civil remedy for violations of federal law. Much of the remedial law under section 1983 is court made, see Chemerinsky, Federal Jurisdiction § 8.11, at 578-85 (4th ed. 2003), and the kind of interstitial problem presented here is especially suited for development through case law.

Tejada for the firing, even if appellants' motives were unlawful. Conversely, suppose in retaliation for protected speech the appellants misled Fuentes into thinking that Tejada had shirked his duties; surely they should be held liable even if Fuentes's own motives were innocent.

Our case falls between such extremes. Even accepting that Fuentes' own motive was "pure," a jury could reasonably doubt that the firing would have occurred if Fuentes had stumbled across the prior conviction on his own. Appellants cite authority under Puerto Rico law for discharging a police officer for domestic abuse. But here Tejada's conviction was over three years old, and the conviction had been expunged under local law after he had received counseling. It is highly unlikely that absent the appellants' prompting, the firing was inevitable.

Nor was Tejada's misconduct of such a kind that would make it unthinkable to retain him as a policeman after its disclosure, as would be the case if he was guilty of mob ties or murder. His misconduct was serious, to be sure; but it was one incident, well in the past, and Tejada had been rehabilitated. This is not a case in which it offends public policy to sanction a defendant who, for improper reasons, revealed Tejada's earlier offense in order to prompt his discharge.

Appellants make a final merits-related claim of qualified immunity. The interplay between qualified immunity and First

-14-

Amendment violations is a difficult subject, partly because the former normally employs an objective standard and the latter--in contrast to the ordinary Fourth Amendment claim--turns heavily upon motive.  This does not mean that qualified immunity can never succeed in a First Amendment case, see Dirrane v. Brookline Police Dept., 315 F.3d 65, 69-71 (1st Cir. 2002), but only that the opportunities may be narrowed.

On appeal, appellants' brief describes qualified immunity doctrine in general terms but makes no effort to apply it to the facts of this case.  An argument not seriously developed in the opening brief is forfeit, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), cert. denied, 494 U.S. 1082 (1990), and that rule certainly applies in this case.  Given that the jury almost surely found that appellants' purpose was improper retaliation, it is not clear how a qualified immunity defense could easily have prevailed.

As for damages, the award of damages corresponds to Tejada's lost police salary between the period of his discharge and the date of judgment in this case.  Appellants say that the jury should have subtracted amounts Tejada apparently earned from other odd jobs during this period (for example, at a gasoline station).  But it might well have been for appellants to elicit such proof, cf. Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 77 (1st

-15-

Cir. 2001) (mitigation), and they may be fortunate not to have been held liable for future wages as well.

The district court has detailed the relevant evidence and calculations that may have led a jury rationally--even "conservative[ly]"--to set compensatory damages at $125,000. Faced with the "formidable burden" of showing that the district court abused its discretion in rejecting their motion for remittitur, <u>Davignon</u> v. <u>Clemmey</u>, 322 F.3d 1, 11 (1st Cir. 2003), appellants have not come close.

<u>Affirmed</u>.

**Dissent follows.**

**CARTER, <u>Senior District Judge</u>, dissenting.** The majority opinion in this case represents a startling anomaly in the established jurisprudence of American compensatory justice--it holds that Plaintiffs may recover damages where it is established without question and <u>as a matter of law</u> that no action of the Defendants proximately caused the damages for which recovery is allowed. The majority founds the result upon an attempted distinction of the case of <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274 (1977), and its own views of correct "policy" in the application of a holding of the United States Supreme Court. <u>See</u> <u>maj. op.</u> at 11-12.

I believe that a proper analysis in this case should look to the posture in which the case was submitted to the jury. Thereafter, the application of the clearly articulated holding of the United States Supreme Court in <u>Mt. Healthy</u> yields the proper result. There should be neither occasion nor need to create a circuit "policy" to abrogate the rule of <u>Mt. Healthy</u>. Law, not local "policy," should control the result in this case. Hence, the cause for my dissent.

The majority opinion correctly describes the conduct of Alvarez and Morales. However, the record clearly shows that the conduct of these underlings, even if improperly motivated, never came to the knowledge or attention of Secretary Fuentes, who is the official who made and executed the decision to discharge the

-17-

Plaintiff. It is undisputed that Fuentes was the "final decision-maker." The majority opinion specifically recognizes that:

> Gierbolini [the incoming acting director] recommended to the newly appointed Secretary of Justice, Jose Fuentes Agostini, that Tejada be discharged <u>for the 1993 domestic violence conviction on the ground that someone with this record should not be a police agent</u>.

<u>Maj. op.</u> at 6 (emphasis added).

Fuentes executed Plaintiff's discharge papers about three weeks later. There is not a scintilla of evidence in this record, nor do I understand the majority to make any assertion to the contrary, that Fuentes ever had communicated to him or that he discovered by any other means any other reason to discharge the Plaintiff than the one he gave (e.g., Plaintiff's prior domestic violence conviction). The majority states that the hearing officer who reviewed Fuentes' discharge action

> recommended discharge because <u>the conduct leading to Tejada's conviction</u> represented, in violation of the Bureau's regulations, "improper behavior or [behavior] damaging to the good name of the agency or the Government of Puerto Rico" and "commission of acts for which it is charged or may be charged a felony or misdemeanor crime."

<u>Id.</u> at 6-7 (emphasis added). There is no evidence that the hearing officer had any knowledge of any basis for discharge of Plaintiff other than the referenced conviction.

The district court found at trial that it was Secretary Fuentes who made the ultimate decision to terminate Mr. Tejada and that Fuentes' decision was based solely on Tejada's conviction for

-18-

domestic violence.[4]  When the district court granted Judgment as a Matter of Law, before submission of the case to the jury, in favor of Secretary Fuentes, it stated, as the basis for its ruling:

> I'm dismissing the case as to the former Secretary of Justice.  I find that there is no legally sufficient evidentiary basis from which a reasonable jury can determine that the motivating factor between the dismissal letter, his action, and plaintiff's actions, that there was a motivating factor in freedom of speech, in violation of his freedom of speech, and I find that there is a very valid nondiscriminatory reason and that's what the evidence points to.

Appendix Volume I, Trial Transcript at 276-77.  The district court reaffirmed its factual findings and legal conclusions based on those findings in a post-trial Opinion and Order:

> The evidence also demonstrated that Fuentes Agostini signed plaintiff's termination letter on February 27, 1997, adopting the recommendation of Miguel Gierbolini that plaintiff be discharged for his domestic violence conviction. Nothing in plaintiff's evidence established that Fuentes Agostini's motivation for signing the termination letter was in any way related to the publication of the newspaper articles or plaintiff's denouncement of corruption. The evidence similarly fell short of establishing Fuentes Agostini's knowledge of plaintiff's protected expressions. Plaintiff nevertheless contends that a reasonable inference can be drawn from the evidence presented. He suggests that from the scanty evidence described above, a reasonable inference can be made that co-defendant Fuentes Agostini

---

[4]The district court's findings on this point were not appealed are not called into question for review on this appeal.  I also note that on appeal Mr. Tejada argues that under Puerto Rican law an employee cannot be terminated for a conviction of domestic violence when the employee has engaged as he did in a rehabilitation program. However, Mr. Tejada did not file a cross-appeal challenging the district court's decision to grant Judgment as a Matter of Law to Secretary Fuentes.  Therefore, the Court cannot reconsider this issue on appeal.

knew of the newspaper articles and was motivated by them. He further claims that it is reasonable to expect that a newly appointed Secretary of Justice will be informed of all the media publications that relate to the Department of Justice, and that when he signed the termination letter he must have been presented with plaintiff's file in which the memoranda containing plaintiff's expressions were addressed. All of these, plaintiff contends, creates a reasonable inference that Fuentes Agostini was motivated by the plaintiff's exercise of First Amendment rights at the time he signed the termination letter. I disagree.

. . .

In this case plaintiff's evidence of Fuentes Agostini's motivation is nothing but conjecture and guesswork.

. . .

There is simply nothing in the evidence proffered by plaintiff to affirmatively link co-defendant Fuentes Agostini to any intentional deprivation of constitutional rights. All the evidence established is that he signed the termination letter adopting the recommendation that plaintiff had violated internal regulations and that his domestic abuse conviction mandated dismissal. Plaintiff has failed to "introduce[] at trial sufficiently adequate evidence for the jury to determine the plausibility of" co-defendant's [Fuentes'] motivations in order to survive a motion under rule 50.

Tejada-Batista v. Fuentes Agostini, 251 F. Supp. 2d 1048, 1053-54 (D.P.R. 2003) (emphasis added).[5]

Hence, the conduct and motivation of Ms. Morales and Mr. Alverez cannot be, as a matter of law, any part of a legally sufficient causative factor in Secretary Fuentes' employment action. Even though the evidence might be construed to establish

---

[5]Secretary Fuentes entered office in January 1997, after the articles were published in El Vocero.

that _their_ termination recommendations were potentially driven by some unconstitutional motivation, they cannot be liable under section 1983 without some evidence of causation between that motivation and the decision by Secretary Fuentes to discharge the Plaintiff. See Beattie v. Madison County Sch. Dist., 254 F.3d 595, 605 (5th Cir. 2001); see also Johnson v. Johnson, 369 F.3d 826, 830 (5th Cir. 2004) ("[I]f the decision-maker who imposed the adverse employment action was not motivated by the speech, then the speech did not cause the adverse employment action.").

Here, as found by the district court, there is no _evidence_ that the final decision-maker, Secretary Fuentes, even knew of Mr. Tejada's protected conduct. Indeed, the district court specifically found that Secretary Fuentes made his own independent decision to terminate Mr. Tejada based on Tejada's prior domestic violence conviction and that there was no evidence upon which to impute any of Ms. Morales' and Mr. Alverez's motives to Secretary Fuentes. Without at least being able to impute appellants' unlawful motives to Secretary Fuentes, those wrongful motives cannot be found to be a _motivating_ factor in the adverse employment action.

Hence, the conduct of the minions, Morales and Alvarez, that the majority imagines to be the "but for" cause of Plaintiff's discharge never, as a matter of law, had any legally cognizable influence or impact of any kind in bringing about _the decision_ by

Fuentes, as affirmed by the reviewing hearing officer, to discharge the Plaintiff.  Any conclusion, even any inference, to the contrary is manifestly in conflict with the district court's conclusion at trial <u>as a matter of law</u> that Fuentes, the final decision-maker, acted without any improper knowledge or motivation.  As a matter of law, there simply cannot be any causal link here between any supposed improper motives of the minions and the discharge implemented by Secretary Fuentes' solitary decision to discharge plaintiff for a proper, stated reason.

It is precisely the purpose and role of the holding in <u>Mt. Healthy</u> to cut off such noncontributory conduct from serving as an efficient causal link to support recovery of damages where the Defendant puts forth a legitimate reason for the discharge.  The United States Supreme Court had its own "policy" basis for casting that holding out into the world of legal precedent; it stated that policy to be its response to fairness considerations that may arise in the course of truly mixed motive cases.  I believe that it is wrong for the majority to casually shunt aside a clearly applicable holding of the Supreme Court in reliance on its own previously

unrecognized "policy"[6] of aversion to rigid rules of burden-of-proof allocation.

In the Mt. Healthy case, the challenged employment action in question consisted of facts that the superintendent of the Defendant school system recommended to the School Board at year-end that the Plaintiff, along with nine other teachers, not be rehired and the action of the School Board in accepting that recommendation. The Court expressly established "a rule of causation," 429 U.S. at 285, that did not focus solely on whether the protected conduct "played a part, 'substantial' or otherwise, in a decision not to rehire . . . ." Id. It found such a rule would unfairly unbalance the framework of permitted decision-making. The evil addressed by the holding was stated to be that:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

---

[6]The majority states, "The question is whether the intervening steps--a final decision-maker acting on a permissible ground--should as a matter of policy (not lack of causation) insulate the wrongdoer from liability." Id. at 12 (emphasis added).

This formulation evades rational footing as Mt. Healthy establishes it to be the dominant legal policy that "lack of causation" does, in fact, insulate from liability one whose conduct is not a motivating factor for the wrongful employment action. The majority has substituted its own policy for the holding of the United States Supreme Court.

-23-

Id. at 286.  The Court went on to state:

> [I]n other areas of constitutional law, this Court has found it necessary to formulate a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused.  We think those are instructive in formulating the test to be applied here.

Id.

After reviewing a compendium of cases that it found to be instructive, the Court found:

> that the proper test to apply in the present context is one . . . which protects against the invasion of constitutional rights without commanding undesirable consequences not necessary to assure those rights.

Id. at 287.  Accordingly, it held that the appropriate analytical inquiry, in terms of causation, should go beyond the question of whether constitutionally protected conduct was a "motivating factor" and that a determination should be made as to whether the Defendant would have taken the same employment action "even in the absence of the protected conduct."  Id.  The failure of the court below to reach that second question was found to require reversal in Mt. Healthy.  In the present case the court below did reach that second question and did resolve it, but in a way that the Mt. Healthy holding clearly contemplates requires that these Defendants be "insulated from liability."[7]

---

[7]I believe that the majority's fundamental error here lies in its inability to accept and respect the fact that a seminal mistake was made by the district court at trial when it made the ruling insulating Secretary Fuentes from liability on the causation analysis of Mt. Healthy and then failed to recognize that its ruling also should have necessarily insulated Morales and Alvarez

-24-

This result has very recently been recognized as the correct application of the holding of Mt. Healthy by another panel of this Court in the case of Webber v. International Paper Co., 417 F.3d 229 (1st Cir. 2005). There, the question was whether the motivations of the Plaintiff's immediate supervisors, Schaub and Moser, could be taken to be adequate circumstantial evidence that the final decision-maker, Oetinger, who testified that Schaub and Moser neither participated in nor contributed to the decision, acted from an improper motivation in taking the adverse employment action in question. The Court there stated, "[t]he pivotal question thus becomes: whether the jury could rationally infer from

from liability. If it be correct that Fuentes is not liable because there is no causal link between his discharge action and the purportedly improper motivations of the minions, then it must also be that the minions are not liable because there is no causal link between their supposed motivations and the damage caused by the proper discharge by Fuentes.

Hence, once the district court made its ruling in favor of Fuentes, it should have also granted judgment in favor of Morales and Alvarez on the basis of that ruling. It was legally wrong to submit the case to the jury as to them because there was no evidentiary predicate, on the court's own finding, on which causation could be sustained.

I believe that it is not proper, as the majority would do, simply to ignore the fact that there is no rational basis in the record for these Defendants' liability. It is not right or reasonable to ignore the occurrence of and the legal significance of the error and to bless a judgment that is patently without any foundation in the law. A simple recognition of the force and effect of the error in assessing these Defendants' liability (e.g., that the judgment imposes liability without causation) will yield a legally sustainable result and respect the rights of these Defendants and the Agency to be insulated from liability because the Agency's final decision-maker acted properly.

these record facts that Moser [the underling] conceivably 'influenced' the decision to fire [the plaintiff]." Id. at 237. Concluding that the evidence would not support such an inference, the panel found that Plaintiff, "failed to meet his burden of proof to show that the proximate cause of his termination was [defendant employer's] discriminatory animus." Id. at 240 (emphasis added). Thus, causation, not local circuit "policy," was taken to drive the decision to affirm the district court's grant of Judgment as a Matter of Law to the Defendant.

The Webber case is a clear application of the Mt. Healthy rule requiring the presence of causational linkage between the conduct of those who are found to harbor discriminatory motivation and the making of the actual, challenged employment decision. It is, I suggest, not proper for this panel to depart from this holding. In this Circuit, each panel of the Court is bound by prior panel decisions directly on point. Jusino v. Sayas, 875 F.2d 986, 993 (1st Cir. 1989).

The seminal holding of Webber, for present purposes, is that where the evidence fails to show that the final decision-maker is influenced adversely by the motivation of lower level actors, the type and level of causation required by Mt. Healthy is absent and must be recognized.[8] A second echelon of "but for" causational

---

[8]The majority attempts to dismiss the controlling effect of Webber by two peremptory and unexplained asides: (1) that the Webber panel "appears to assume arguendo" that the tainted action

-26-

of an underling communicated to a pure-minded supervisor may be the basis for liability, and (2) that the Court found that the superior "had determined to terminate the employee on legitimate grounds before any contact with the supervisor [occurred] and that the supervisor had no causal influence on the firing." Maj. op. at 13 (emphasis in original).

Both of these observations strike me as irrelevancies in understanding the Webber opinion, and they perpetuate the majority's unwillingness to recognize the direct and focused thrust of the holding in Mt. Healthy (e.g. that a pure-minded final decision-maker is, in effect, an efficient intervening cause destroying the existence of proximate cause between the adverse animus of others than the final decision-maker and the damage resulting from the employment decision).

The factual circumstances in Webber were that the underlings, Schaub and Moser, had made remarks that plaintiff claimed showed that they harbored discriminatory intent toward the plaintiff. There was no evidence that they ever told Oettinger, the final decision-maker, that plaintiff should be discharged in the RIF. The panel concluded that it would be, on the record, excessively speculative for a jury to conclude that "Moser conceivably 'influenced' the decision to fire [the plaintiff]." Id. at 237. The record showed, the panel found, that Oettinger, the plaintiff's ultimate superior and final decision-maker, had decided for proper reasons, to discharge the plaintiff. He then went to the underlings, Schaub and Moser, to notify them of his initial decision, not to seek their opinion, but rather to ascertain if he, Oettinger, had missed "any material termination-related facts." Id. Schaub and Moser simply acquiesced in the decision, apparently without comment. The plaintiff conceded that they did not communicate to Oettinger any discriminatory animus that they may, in fact, have harbored. Id. at 236. Oettinger implemented the decision to discharge plaintiff.

What the panel "assumed arguendo" was clearly stated by the panel in the opinion.

> [W]e shall assume arguendo that, even in the absence of any ... direct, affirmative communication between Oettinger and Moser, a supervisor's silence (viz., his discriminatory failure to utilize the veto power conferred upon him by his employer) could constitute sufficient "participation" or "influence" to warrant imputing [the supervisor's] purported animus to [the

-27-

conduct will not suffice to bridge the gap between liability and damage that is created by the absence of motivated causational conduct of the final decision-maker. This case is much stronger than Webber because here that absence is established in the record whereas in Webber the contrary was established by concession of the Plaintiff (assuming the record is to be given any weight in appellate consideration) as a matter of law.

I suggest this panel is properly bound by the holding of the Webber case since it has not been subsequently overruled and no other exceptional circumstances apply to call in question the

---

final decision-maker].

Id. at 237. This appears to me to be an appropriate understanding of the law under Mt. Healthy.

However, that understanding does not have the effect on the application of Webber here that the majority attribute to it. The operative finding of the panel in Webber was not that Oettinger made the discharge decision before consulting with Schaub and Moser but rather that he made it without any influence from them, and it is easily argued from the panel's language that the panel assumed that had there been any evidence that the underlings had a bad animus toward plaintiff, the failure to exercise in favor of plaintiff the implicit "veto power" Oettinger gave them by consulting with them would have been a sufficient causative "influence" upon the final decision-maker for Mt. Healthy purposes to result in a triable issue of proximate cause. That is the controlling factual underpinning for the decision that the case should not have gone to the jury because of the total absence of any evidence of causation. That is, in both respects, a correct application of the holding in Mt. Healthy. The state of mind of the underlings is irrelevant once it is established, as the panel in Webber found it to be, that that state of mind had no influence on the decision-maker. In such a scenario it is also irrelevant when, in the course of events, the final decision-maker reached his final decision.

-28-

viability of that prior ruling.  <u>Maine General Medical Center</u> v. <u>Shala</u>, 205 F.3d 493, 497 (1st Cir. 2000); <u>Williams</u> v. <u>Ashland Engineering Co.</u>, 45 F.3d 588, 592 (1st Cir. 1995).  The <u>Webber</u> decision was recently rendered, on August 9, 2005, and there is no circumstance that postdates that decision, "that offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." <u>Williams</u>, 45 F.3d at 592.

Thus, I believe the judgment below should be reversed to comply with the applicable, direct holding of the United States Supreme Court in the <u>Mt. Healthy</u> case and the previously announced rule of decision in this Circuit under that precedent in the <u>Webber</u> case.